FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

OCT 28 2010

JAMES R. LARSEN, CLERK
_____DEPUTY
SPOKANE, WASHINGTON

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re:<br><br>THE CATHOLIC BISHOP OF SPOKANE a/k/a THE CATHOLIC DIOCESE OF SPOKANE, a Washington corporation sole,<br><br>Debtor. | Nos.. CV-10-083-JLO<br>CV-10-084-JLQ<br><br>**MEMORANDUM OPINION** |

**"Further, if it ultimately prevails on its appeal that TCR (tort claims reviewer) determinations can and should be reviewed for ultra vires acts and abuse of discretion, the Diocese reserves all rights to look to the Trustee to reimburse the FC (future claims) Fund for money paid out on claims that do not qualify under the Plan as Future Claims."**

This single-sentence, in a slightly longer one-paragraph e-mail dated January 13, 2010, from Gregory Arpin, the attorney for the Spokane Diocese, the bankruptcy Debtor, to attorney Gloria Nagler, chosen by the parties to serve as Trustee under a Plan to resolve claims against the Diocese, was the basis for the Bankruptcy Court finding Mr. Arpin, his law firm, and the Diocese in contempt of court. The e-mail has spawned months of litigation since the attorney Trustee moved to have Mr. Arpin held in contempt of court for sending the e-mail. The parties have allegedly incurred tens of thousands of dollars in legal fees before the Bankruptcy Court on this issue, and the parties have filed *in toto* over 100 pages of briefing in this court.[1] The parties appeared

---

[1] The entire text of the e-mail is attached as Ex. A, and is in the Court's Record at C.R. 9-74.

for oral argument on the appeal of the contempt findings and sanctions on October 4, 2010.  John Munding appeared for the Diocese.  William Etter argued on behalf of Mr. Arpin and his law firm, Paine Hamblen.  Mr. Arpin was also present in court.  David Kerruish argued on behalf of the attorney Trustee.

Gloria Nagler, an experienced attorney and the Plan Trustee ("Trustee" or "Plan Trustee" herein), claimed the e-mail was a "direct threat" of personal liability against her, and apparently considered whether her malpractice insurance would provide such coverage. (BK 2443-1, Declaration of Gloria Nagler at ¶¶ 6-7).  Gregory J. Arpin, the attorney for the Debtor, ("Mr. Arpin"), who sent the e-mail at issue, construed his e-mail as "nothing more than fulfilling my legal duties as an advocate for my client," and stated he had no intent "to coerce or intimidate" the Trustee. (BK 2464, Declaration of Gregory Arpin).[2]  However, the attorney Trustee, Ms. Nagler, instituted proceedings in the Bankruptcy Court seeking to have the Diocese, Mr. Arpin, and his law firm held in contempt of court for the sending of the e-mail.

It is undisputed that neither the Diocese or its counsel was in violation of any Order of the Bankruptcy Court that could be made the basis of the contempt order of March 19, 2010 (the "Contempt Order"), which is the subject of this appeal.  The Bankruptcy Court stated:  "The Debtor did not violate any court order, however contempt of court can occur even though no violation of a court order has occurred." (BK 2508 p. 3).  The Bankruptcy Court found that the e-mail "essentially threatened the Plan Trustee with personal liability." (BK 2508 p. 4).  The Bankruptcy Court found the e-mail to be willful and made in bad faith, and held the Diocese, Mr. Arpin, and Mr. Arpin's law firm in contempt of court. (BK 2508).

The Debtor, the Catholic Diocese of Spokane, Mr. Arpin, and his law firm, Paine Hamblen have appealed the finding of contempt of court.  They present the following primary issues for decision by this court:  1) Did the Bankruptcy Court err in finding the

---

[2]The documents originally filed in the Bankruptcy Court and part of this record on appeal are referenced as "BK" followed by their Bankruptcy Court document number.

1   Debtor and its counsel in contempt of court; and 2) did the Bankruptcy Court err in

2   imposing monetary sanctions? (C.R. 11, p. 2; C.R. 12, p. 3).

3   **Standard of Review**

4          In reviewing a bankruptcy court's decision, this court conducts "de novo review of

5   legal conclusions and clear error review of factual findings." *In re Myrvang*, 232 F.3d

6   1116, 1120 (9th Cir. 2000).  Mixed questions of law and fact are presumptively reviewed

7   de novo because they require consideration of legal concepts and the exercise of

8   judgment about the values that animate legal principles. *Id.*

9          Imposition of sanctions is reviewed for an abuse of discretion. *In re Lehtinen*, 564

10  F.3d 1052, 1058 (9th Cir. 2009).  However, a bankruptcy court does not have authority

11  to award significant punitive sanctions under either the civil contempt authority of 11

12  U.S.C. § 105 or its inherent authority. *In re Dyer*, 322 F.3d 1178, 1182 (9th Cir. 2003).

13  A court abuses its discretion in imposing sanctions when it bases its decision "on an

14  erroneous view of the law or on a clearly erroneous assessment of the evidence." *Mark*

15  *Industries v. Sea Captain's Choice*, 50 F.3d 730, 732 (9th Cir. 1995).

16  **Discussion**

17         **A. Background**

18         Faced with a number of claims by alleged victims of sexual abuse by one or more

19  priests previously serving in the Diocese of Spokane, the Diocese filed a reorganization

20  petition in the Bankruptcy Court of this district.  In resolving those matters, the Diocese

21  and the claimants entered into a Catholic Diocese of Spokane Plan Trust Agreement For

22  Qualified Settlement Fund (the Plan).  Gloria Nagler, a Seattle attorney, was named as

23  the Plan Trustee with provision for initial compensation at the rate of $290 per hour.

24  Article 6 c. of the Plan empowered the Trustee to pay "Allowed Tort Claims,

25  Professional Fees, and Plan Trust Costs and Expenses pursuant to the terms of the Plan."

26  Of import to the matter *sub judice* is that portion of Article 7 of the plan which provides

27  as follows:

28

3

Article 7.  Immunity and Identification of Plan Trustee

a.  Generally

The Plan Trustee shall not be personally liable for mistakes in judgment, errors of fact or law, or other acts or omissions during the administration of the Plan Trust, **in the absence of willful misconduct or ultra vires acts.** The Plan Trustee who meets the standards of conduct provided by Article 7.b. of the Plan Agreement shall be indemnified by the Plan Trust for reasonable costs and expenses, including but not limited to attorneys' fees, incurred in connection with any claim as provided in Article 7(b) below. (Emphasis supplied).

It appears that following the adoption of the Plan a dispute arose over the allowance of certain claims against the Diocese by the Tort Claims Reviewer (TCR). The Diocese brought a motion asking the Bankruptcy Court to review the allowance of claims and a hearing thereon was held on November 4, 2009.  At that hearing the attorney for the claimants, Mr. Jackson, made a statement that the Diocese had sent "threatening" letters to the Plan Trustee.  Counsel for the Plan Trustee, David S. Kerruish, who also represents the attorney Trustee on this appeal, refuted the "threatening" allegation stating as follows:

**I wouldn't think it would be fair to characterize us as having received any kind of threats of any kind.**

What we have received is an interpretation of the plan which, I, myself, as counsel for the plan trustee would interpret to be based upon an ultra vires type of question.  In other words, I have concluded based upon the information supplied to the plan trustee that a payment made under the Diocese theory would potentially be ultra vires.  So, I want to be fair to the Diocese in the sense that I don't want it to sound like they're more aggressive that they are.  I'm reaching a conclusion to protect my client.  (BK 2460, Ex. B at page 9).

At the same hearing, Mr. Kerruish set forth the Plan Trustee's concerns as:

the plan trustee is--is concerned because we have a  situation in which we have-the plan trustee has some potential exposure. On one hand, the plan trustee is directed to make payment by that November 11th date to the people who have been determined to be qualified as future tort claimants by the TCR.

On the other hand, we have knowledge that there is a contention by the Diocese that the people who have been identified as recipients of funds do not qualify under the plan for the receipt of the funds. And the concern for my client, the plan trustee, is that she not be placed in the position of potentially, after the fact, having been found to have made a payment which was outside the scope of her powers under the plan.

In other words, some type of an *ultra vires* act in which she pays out someone who she's directed to pay by the . . . tort claims reviewer, and yet at some later date then there's a determination made through some proceeding that that person didn't qualify under the plan and fell outside the scope of the plan, and therefore, the plan trustee didn't have the power to make the payment.  (BK 2460,Ex. B. page 7.)

Thereafter, the Bankruptcy Court ruled that it had no jurisdiction to review the TCR's determinations and on December 30, 2009 directed the Trustee to proceed with distribution to the claimants commencing January 6, 2010.  The Diocese, represented by Mr. Arpin, filed a Notice of Appeal of the Bankruptcy Court's December 30, 2009 Order. Mr. Arpin also moved to have the Bankruptcy Court stay its payment Order pending the appeal.  That motion was denied, but no Notice of Appeal of that Order was filed by Mr. Arpin on behalf of the Diocese.

On January 13, 2010, Mr. Arpin sent the e-mail to the attorney Trustee as set forth *supra.*  Thereafter the Trustee sought and obtained an Order directing the Diocese and its attorneys to show cause why they should not be held in contempt of court for the sending of this e-mail to the attorney Trustee.  After a contempt hearing, the Bankruptcy Court found the Diocese, the attorney Gregory Arpin, and his law firm of Paine Hamblen in contempt of court and ordered them to pay over $52,000 as sanctions, including $450 an hour to the future claimant's attorney, plus fees and costs of the attorney Trustee and her attorney.

**B.  The Bankruptcy Court's Contempt Order**

The Bankruptcy Court found that it was "not the sending of the e-mail itself, it is the inclusion of the last sentence contained in the e-mail which gives rise to controversy." (BK 2508 p. 2).  Thus the Bankruptcy Court held it was not improper for

Mr. Arpin to communicate with the attorney Trustee.  Rather the Bankruptcy Court took issue with the substance of the single sentence.  It is undisputed that the e-mail did not violate any order of the Court: "The Debtor did not violate any court order...". (BK 2508 p. 3).  Notably, the Trustee's "Motion for Order to Show Cause For Holding Debtor and its Counsel in Contempt" (BK 2443), asked why Debtor and Mr. Arpin "should not be held in contempt of this Court's Orders on Confirmation of the Plan, Regarding Payment of Future Claims, and Denying Stay of Proceedings Pending Appeal." (BK 2443, p. 1).  Thus in its contempt Motion, the Trustee urged that Debtor and Mr. Arpin had violated the Bankruptcy Court's orders.  However, the Bankruptcy Court found to the contrary.

The Bankruptcy Court found that "all parties knew that the Debtor believed that it could have some claim against the Trustee." (BK 2508 p. 4).  Thus the last sentence of the e-mail was merely reiterating the Debtor's well-known legal position--that if successful on appeal, and upon the Trustee's act being found *ultra vires*, then the Diocese would look to the Trustee to refund monies improperly paid.  The Plan Trust Agreement for Qualified Settlement Fund, quoted *supra,* referenced the basis for such a position, stating in part  at Paragraph 7.1(a): "The Plan Trustee shall not be liable for mistakes in judgment, errors of fact or law, or other acts or omissions during the administration of the Plan Trust, in the absence of willful misconduct or ultra vires acts." (BK 2460 p. 9).

The Bankruptcy Court's Contempt Order states: "Although it may be advisable to once or twice tell someone that their actions may give rise to legal liability or a claim against them, at some point repeating those statements became intimidation, particularly where there is no legitimate purpose to be gained from making the statement." (BK 2508 p. 5).[3]  The Bankruptcy Court cited to no authority for the proposition that a statement which is "advisable" to say twice, becomes contemptible when said a third time, particularly under the circumstances herein where all parties apparently recognized that

[3]The order was drafted by the parties based on the Bankruptcy Court's oral ruling. See transcript containing oral ruling at (BK 2489).

the attorney Trustee could be held responsible for ultra vires acts. The e-mail explicitly
stated that a claim was possible only if the Diocese was first successful on appeal of the
Bankruptcy Court's decision that it had no jurisdiction to review the TCR decisions and
then only if the actions of the Trustee were found to be *ultra vires*.  The Trustee did not
contend that the position of Mr. Arpin on behalf of the Diocese in the challenged e-mail
was frivolous and apparently could not so argue because under the specific language of
the Plan the Trustee could be liable for *ultra vires* acts.

      The Bankruptcy Court stated that it was making its decision "based only on the
court's inherent authority," and not on 11 U.S.C. § 105. (BK 2508 p. 9).  The Bankruptcy
Court then found that contempt had occurred, "based upon the bad faith communication
of the e-mail." (BK 2508 p. 9).  The Bankruptcy Court found that appropriate sanctions
are "those sanctions necessary to compensate those who suffered loss from the
intimidation of the Plan Trustee." (BK 2508 p. 10).  The Bankruptcy Court found the
necessary sanctions included the Trustees' fees and expenses related to the contempt
proceeding and also a Motion to Enforce the Plan, filed by Mr. Jackson, on behalf of
nine of the tort claimants. (BK 2508 p. 10).

**C. Was the E-Mail a Threat and did it Prevent the Trustee from Complying**
**with the Bankruptcy Court's Order?**

      A review of the transcript from the Bankruptcy Court hearing on November 4,
2009, is informative in making this determination.  At the hearing, the process for paying
future tort claims was discussed. As quoted, *supra,* David Kerruish ("Mr. Kerruish"),
counsel for the Trustee, expressed concern about whether the Trustee could make a
payment, authorized by the Tort Claims Reviewer ("TCR"), and later have that action
determined as *ultra vires* as exceeding the scope of the Trustee's powers. (BK 2460 p.
26).  Mr. Jackson argued that the Debtor had sent "threatening letters" concerning the
Debtor's belief that the TCR was improperly authorizing some future claims. (BK 2460
p. 27).  Mr. Kerruish quickly interjected and stated, as cited above, that he did not
characterize any actions or communications of the attorney for the Diocese as threats.

"I wouldn't think it would be fair to characterize us as having received any kind of threats of any kind. What we have received is an interpretation of the plan...I want to be fair to the Diocese in the sense that I don't want it to sound like they're more aggressive than they are." (BK 2460 p. 28).

Thereafter, the same statement of the Debtor's legal position in the e-mail to the attorney Trustee, which the Trustee's attorney had specifically denied as threatening in November 2009, suddenly two months later, was viewed as so egregious to warrant the attorney Plan Trustee moving the Bankruptcy Court for contempt of court proceedings.

Mr. Arpin's e-mail did not constitute a threat. There is nothing malicious about the e-mail. It does not tell the Trustee what to do. It does not tell the Trustee that she cannot disburse funds. It does not tell the Trustee that she should not comply with orders of the Bankruptcy Court. The attorney Trustee claims that fear of future legal action by the Debtor to recover the funds Debtor contends were improperly approved by the TCR would naturally lead the Trustee not to disburse funds, and thus not to comply with the Bankruptcy Court's order. The attorney Trustee's own declaration belies that contention. The Trustee contends that Mr. Arpin's statement of his legal position "cannot be made in good faith under any rational application of law or facts to these circumstances." (BK 2443-1 p. 4). Thus the Trustee viewed Mr. Arpin's legal position as baseless, and perhaps frivolous. A 'threat' of pursuing a frivolous legal claim should not dissuade the Trustee from complying with a court order. In the event that Mr. Arpin at some future date initiated frivolous or baseless legal proceedings, that would be the appropriate time to seek sanctions as opposed to moving for contempt based on the e-mail from one attorney to another setting forth the Diocese's legal position. This court expresses no opinion on the merit of Mr. Arpin's legal position, but observes that the manner in which the statement was made was certainly not threatening, and the e-mail did not control the Trustee's actions. The Trustee felt the Debtor's position, as stated in the e-mail, was legally and factually baseless.

A member of the bar is not prevented from complying with a court order or pursuing a legal position by an opponent stating its legal strategy. For example, if

defense counsel tells a plaintiff: "I think your complaint is frivolous, and if I succeed in getting it dismissed, we will pursue a malicious prosecution claim," this does not prevent a plaintiff from pursing her claim.  This is not a threat that shows contempt for the court.  Upholding the Bankruptcy Court's contempt ruling would have a chilling effect on the exchange of communications concerning legal positions that occur between counsel on an ongoing basis.

Mr. Arpin stated in the e-mail that if the Diocese's position was found to be correct ("if it ultimately prevails on its appeal"), then it reserved the right to pursue the Trustee (who would have disbursed the funds) for reimbursement if her actions were determined to be *ultra vires*.  The Plan Trust Agreement for Qualified Settlement Fund, quoted above and referencing *ultra vires* acts, so stated.  (BK 2460 p. 9).  Mr. Arpin's e-mail simply stated that if the Diocese "prevails on its appeal that the TCR determinations can and should be reviewed for ultra vires acts," and that if the TCR was later determined to have acted *ultra vires*, the Diocese would look to the Trustee to reimburse the future claims fund for non-qualifying claims that were wrongfully paid.  Such is legitimate advocacy, not an abusive litigation tactic or threat.

The issue of the authority of the TCR and the validity of her approval of future claims does not appear to be frivolous.  The Bankruptcy Court did not make a finding that the Diocese advanced a frivolous legal position.  A motion for sanctions was not filed pursuant to Fed.R.Bank.P. 9011.  The Trustee herself filed a Motion for an Order re Payment of Future Claims (BK 2346) in which she stated: "The Plan Trustee may risk liability for a payment made to a claimant who, according to the Reorganized Debtor's position, did not hold a qualified future claim within the scope of the Plan." (BK 2346 p. 4).  The Trustee stated, on October 22, 2009 when the motion was filed, that it was "unclear whether Reorganized Debtor could seek to hold the Plan Trustee liable" under such circumstances. (BK 2346 p. 4).

After the subsequent rulings of the Bankruptcy Court, the Trustee apparently contended in the contempt proceedings that there was no way she could be liable for

1    acting in accord with the Bankruptcy Court's order concerning future payments and the

2    Plan. She contended the Diocese's 'threat' of reserving the right to look to the Trustee for

3    reimbursement was baseless. If so, then the e-mail should have had no effect on her

4    ability to perform her duties. In fact, the Trustee, apparently believing the Diocese's

5    position concerning the TCR and future claims at least had some validity and viewing

6    the issue as "unclear," had previously sought to delay payments. The Trustee obtained

7    an order delaying payment to January 6, 2010. (BK 2392). As of January 13, 2010, the

8    date of the alleged e-mail 'threat,' the Trustee had still not made payments.

9         Following the contempt Order and in a separate appeal involving whether the

10   Bankruptcy Court had the authority to review the TCR's decisions and determine

11   whether they are ultra vires, a judge of this District Court noted that "the Plan expressly

12   subjects the TCR to liability for willful misconduct and ultra vires acts," but gives the

13   TCR "discretion to determine the merits of tort claims and states those determinations

14   are final and not appealable." (Cause No. CV-09-00393-LRS, Ct. Rec. 19, p. 4-5). The

15   District Court additionally stated: "there is no question the bankruptcy court retains

16   jurisdiction to review any alleged "ultra vires" determinations of the TCR." (CV-09-

17   00393, Ct. Rec. 19, p. 6).

18        This court expresses no opinion on the authority of the TCR, the validity of future

19   claims, or the prospect, if any, of liability against the Trustee. The court does conclude

20   that the January 13, 2010 e-mail was not threatening, was not an abusive litigation tactic,

21   should not have dissuaded the Trustee from her obligations, and could not be the basis

22   for finding the attorney author and his client in contempt of court with its commensurate

23   stigma. The e-mail communication was the attorney's statement of the Debtor's legal

24   position, on what the Trustee had previously recognized as an "unclear" legal issue, and

25   which the Trustee's legal counsel had previously recognized as not a "threat[] of any

26   kind".

27        **D.  The Finding of "Contempt" was Invalid**

28        The Bankruptcy Court found that no violation of a court order had occurred. (BK

1  2508 p. 3).  The Ninth Circuit Court of Appeals has stated: "The standard for finding a

2  party in civil contempt is well settled: The moving party has the burden of showing by

3  clear and convincing evidence that the contemnors **violated a specific and definite**

4  **order of the court.**" *In re Dyer*, 322 F.3d 1178, 1190-91 (9th Cir. 2003) (emphasis

5  added).  There was no finding of violation of a court order.  To the contrary the

6  Bankruptcy Court found no violation of a court order had occurred.  Thus, any finding of

7  contempt based on a violation of a court order would be erroneous as a matter of law.

8      **E. Inherent Authority**

9        Although the Bankruptcy Court's order is entitled "Order re: Contempt of Court,"

10  and the Bankruptcy Court made a finding of contempt, it stated it based its decision

11  "only on the court's inherent authority." (BK 2508 p. 9).  The civil contempt authority

12  under 11 U.S.C. § 105 and the court's inherent sanction power are discernible. *In re*

13  *Dyer*, 322 F.3d 1178, 1196 (9th Cir. 2003).  "Civil contempt authority allows a court to

14  remedy a violation of a specific order." *Id.*  As discussed *supra*, the finding of contempt

15  was in error.

16        The Ninth Circuit has held that bankruptcy courts do possess the inherent power to

17  sanction bad faith or willful misconduct. *In re Dyer*, 322 F.3d 1178, 1196 (9th Cir.

18  2003).  This inherent authority is broader than the civil contempt authority which

19  requires a finding of violation of a specific order: "inherent sanction authority allows a

20  bankruptcy court to deter and provide compensation for a broad range of improper

21  litigation tactics." *Id.*  However, a bankruptcy court has no authority to impose sanctions

22  which are punitive. *Id.* at 1197.

23        In order to impose sanctions under its inherent authority a bankruptcy court "must

24  make an explicit finding of bad faith or willful misconduct." *In re Lehtinen*, 564 F.3d

25  1052, 1058 (9th Cir. 2009).  Bad faith or willful misconduct "consists of something more

26  egregious than mere negligence or recklessness." *Id.*   Due process further requires that

27  notice and opportunity to be heard be given prior to imposing sanctions. *Nuwesra v.*

28  *Merrill Lynch*, 174 f.3d 87, 92 (2nd Cir. 1999).  The notice must advise of the specific

conduct alleged to be sanctionable and the standard by which that conduct will be assessed. *Id.* see also *In re Deville*, 361 F.3d 539, 548 (9th Cir. 2004) ("A court's failure to give notice of intent to exercise inherent power may, therefore, invalidate the sanctions imposed.").

The notice provided by the Bankruptcy Court in its "Order Directing Debtor and Its Counsel To Appear And Show Cause Why A Contempt Order Should Not Be Issued" (BK 2450) ("Show Cause Order"), did not specifically advise Debtor or its counsel of the allegedly offending conduct, other than by reference to the Trustee's motion. However, the Trustee's motion clearly demonstrated that it believed the e-mail was improper. The Bankruptcy Court's Show Cause Order also gave no indication that it was contemplating imposing sanctions pursuant to its inherent authority, rather it directed Debtor and counsel to "appear and show cause why they should not be held to be in contempt of the Court's Orders on Confirmation of the Plan, Regarding Future Payment of Future Claims and Denying Stay of Proceedings Pending Appeal." (BK 2450). Apparently Debtor and its counsel successfully demonstrated that they were not in violation of any order of the Bankruptcy Court, but the court nonetheless imposed sanctions pursuant to its inherent authority.

Failure to advise that it may act pursuant to its inherent authority is not necessarily fatal, see *In re Deville*, however the Ninth Circuit therein stated: "Our holding should not be taken as an indication that this court regards a bankruptcy court's non-reference to inherent power as a source of sanctioning authority as a matter of little consequence." 361 F.3d 539, 549 n. 4 (9th Cir. 2004). The Ninth Circuit then cited approvingly to the Third Circuit's admonition: "We do not expect, however, that the result reached here will be often justified in future cases where the sanctioned party was not explicitly informed beforehand of the precise ground for the imposition of sanctions." *Id.* The Show Cause Order did not properly advise Debtor and Mr. Arpin that sanctions were being considered pursuant to the Bankruptcy Court's inherent authority because the e-mail was an alleged abusive litigation tactic. Rather, the Show Cause Order directed Debtor and

Mr. Arpin to appear and show cause why they should not be held in contempt for violating a court order. Even if this was sufficient notice of the offensive conduct and basis for sanctions, this court determines that the finding of bad faith was in error, and thus the imposition of sanctions was an abuse of discretion.

The Bankruptcy Court awarded approximately $52,000 in attorneys fees and costs. The Bankruptcy Court found that it was necessary for the Trustee to file the motion seeking a finding of contempt and that it was also necessary for Mr. Jackson to file a motion to enforce the Plan on behalf of future tort claimants. Under limited circumstances, a bankruptcy court may award compensatory sanctions and attorney fees, but not punitive sanctions, pursuant to its inherent authority. This is not a situation such as one where a litigant was required to file a motion to compel to obtain discovery to pursue her claims, in which instance the costs of the motion could be considered compensatory. Nor is the Motion to Enforce the Plan brought by future claimants (BK 2442) attributable to the Debtor or its counsel. That motion, filed on January 22, 2010, was filed 16 days after the Trustee was to have begun disbursing funds. If the Trustee was failing to comply with the Bankruptcy Court's order (allegedly because of the e-mail 'threat' which she viewed as legally and factually baseless), then that was a failing of the Trustee. The future claimants sought to compel the TCR and Trustee to act, not the Debtor. (BK 2442 p. 8, requesting the Bankruptcy Court "Order that the TCR shall continue to receive, determine and make decisions to deny or award future claims. The Court should Order that the Plan Trustee shall pay..."). Thus the Motion to Enforce (BK 2442) was not occasioned by Mr. Arpin's e-mail, but rather by the Trustee's actions or inactions.

The Bankruptcy Court made a finding of bad faith. (BK 2508 p. 8). This finding is based solely on one-sentence in the e-mail, and according to the Bankruptcy Court, on the "context of the case." (BK 2508 p. 5). The Bankruptcy Court believed there was no legitimate purpose for the e-mail and even though the statement may have been advisable to say once or twice, it was contemptible when said a third time. This was a clearly

erroneous assessment of the evidence for the reasons detailed in Section C of the Discussion, *supra*.

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *In re Lehtinen*, 564 F.3d at 1059. Mr. Arpin's e-mail did not constitute bad faith or willful misconduct, and thus the finding that Mr. Arpin was in contempt of court, a stigma that would stay with him, followed by the imposition of sanctions pursuant to inherent authority was clearly erroneous and an abuse of discretion.

### F. Joint and Several Liability

Even if Mr. Arpin had engaged in sanctionable conduct, which this court finds he did not, the finding of contempt and award of sanctions against the Debtor was improper. The Bankruptcy Court imposed sanctions against the Debtor based on an absence of evidence: "There is no evidence upon which to distinguish the actions of Debtor...". (BK 2508 p. 9). The Bankruptcy Court found the offensive conduct to be one sentence in an e-mail that Mr. Arpin sent. This is an insufficient basis for imposing sanctions against Debtor. "Sanctionable conduct by a party's counsel does not necessarily parlay into sanctionable conduct by a party." *In re Ocon*, 2009 WL 405370 (11th Cir. 2009) citing *Byrne v. Nezhat*, 261 F.3d 1075, 1123 (11th Cir. 2001).

Although a court may sanction a party pursuant to its inherent authority, this typically requires a finding of bad faith supported by specific factual findings. Although the Bankruptcy Court found Mr. Arpin acted in bad faith, there are no specific findings made against the Debtor. *Byrne v. Nezhat*, 261 F.3d 1075, 1123 (11th Cir. 2001) ("a court must do more than conclude that a party acted in bad faith; it should make specific findings as to the party's conduct that warrants sanctions.") Bad faith is a "high threshold" and the Ninth Circuit has previously refused to find that a litigant's arguments, which the trial court found to be "totally frivolous" "outrageous" and "inexcusable," equated with "bad faith." *Mendez v. County of San Bernardio*, 540 F.3d 1109, 1132 (9th Cir. 2008). Courts should use caution when imposing sanctions against parties: "if the fault lies with the attorneys, that is where the impact of the sanction

1  should be lodged." *M.E.N. Co. v. Control Fluidics*, 834 F.2d 869 (10th Cir. 1987).

2  Although not controlling for purposes of sanctions under the court's inherent powers,

3  both Fed.R.Civ.P. 11 and 28 U.S.C. § 1927 counsel against haphazardly imposing

4  sanctions against a client for actions of counsel. See *Dible v. City of Chandler*, 242

5  Fed.Appx. 473 (9th Cir. 2007) ("Rule 11 does not provide for the imposition of sanctions

6  upon the clients for the sins of their attorney..."); *Sneller v. City of Bainbridge Island*,

7  606 F.3d 636, 640 (9th Cir. 2010) ("The sanction here was imposed jointly on counsel

8  and client, but § 1927 authorizes sanctions only upon counsel.").

9      A court's inherent sanction powers "must be exercised with restraint and

10  discretion." *Mendez v. County of San Bernardio*, 540 F.3d 1109, 1132 (9th Cir. 2008).

11  In imposing sanctions against the Debtor based on one-sentence in the e-mail sent by Mr.

12  Arpin the Bankruptcy Court erred.

13  **Conclusion**

14      The Bankruptcy Court's finding that the one-sentence in Mr. Arpin's e-mail was a

15  sanctionable threat was clearly erroneous. Counsel for the Trustee, Mr. Kerruish

16  recognized that the statement of the Diocese legal position was not a threat at the

17  November 2009, hearing. The Bankruptcy Court's finding of "contempt" and imposition

18  of sanctions "for the contempt" was incorrect as a matter of law. A finding of contempt

19  based on the alleged violation of a court order requires a determination that an

20  individual violated a specific and direct order of the court. Here it is undisputed that

21  neither the Debtor or its counsel violated an order of the court. To the extent the

22  Bankruptcy Court acted pursuant to its inherent authority in imposing sanctions, for the

23  reasons stated above, the sanctions constituted an abuse of discretion. Lastly, it was

24  error to impose sanctions against the Debtor itself based on "no evidence," *supra,* and to

25  advise the Debtor and its counsel they could "work it out." (BK 2508 p. 9). The

26  Bankruptcy Court made no specific findings of bad faith against the Debtor, and the

27  award of sanctions against it was improper.

28      An Order in this matter will subsequently issue.

**IT IS SO ORDERED**.  The Clerk is hereby directed to enter this Memorandum Opinion and furnish copies to counsel.

**DATED** this 28th day of October, 2010.

s/ Justin L. Quackenbush
JUSTIN L. QUACKENBUSH
SENIOR UNITED STATES DISTRICT JUDGE

Case 2:10-cv-00084-JLQ    Document 23    Filed 10/28/10

04-08822-PCW11    Doc 2498-2    Filed 03/10/10    Entered 03/10/10 11:25:17    Pg 1 of 1
Case 2:10-cv-00083-JLQ    Document 9-74    Filed 06/21/10

**Gloria Nagler**

| | |
|---|---|
| **From:** | Greg Arpin [greg.arpin@painehamblen.com] |
| **Sent:** | Wednesday, January 13, 2010 5:28 PM |
| **To:** | gloria@naglerlaw.com; david@kerruishlaw.com |
| **Cc:** | Kate Pflaumer; Gerald Kobluk; John Munding; Daniel J. Gibbons; Bruce Bennett |
| **Subject:** | Future Claims |

Gloria and David:

The Diocese has determined not to request from the District Court a stay of the claim payments pending its appeal. It does intend however on pursuing its appeal of the issues raised by Judge Williams' determinations regarding review of the TCR's claims decisions. If during the course of that appeal, the TCR issues any rulings allowing additional claims which allowances we feel are in violation of the terms and conditions of the Plan regarding future claims, we will move at that time with the District Court for stay of payments on any such claims pending resolution of the issues on appeal. Further, if it ultimately prevails on its appeal that the TCR determinations can and should be reviewed for ultra vires acts and abuse of discretion, the Diocese reserves all rights to look to the Trustee to reimburse the FC Fund for money paid out on claims that do not qualify under the Plan as Future Claims.

Greg


EXHIBIT A